**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS ALTMAN and ROXANA ALTMAN, husband and wife,

Plaintiffs,

vs.

BOBCAT COMPANY , et al.,

Defendants.

NO. 05-00956

Honorable Donetta W. Ambrose

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL PURSUANT TO RULE 59 AND FOR OTHER RELIEF**

Defendant, Bobcat Company, by and through its attorneys, Wayman, Irvin & McAuley, LLC, files the following Memorandum of Law in Support of its Motion for a New Trial Pursuant to Rule 59 and for Other Relief.

**INTRODUCTION**

Pursuant to Rule 59(a), Bobcat Company moves this Honorable Court to grant a new trial on all issues. This Court has the power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. Bobcat Company was deprived of its fundamental right to a fair jury trial as a result of, both individually and cumulatively, (1) evidentiary errors, (2) juror misconduct, (3) attorney misconduct, and (4) errant jury instructions. In addition, the verdict was overwhelmingly against the great weight of the evidence. For any one or more of these legal bases, Bobcat Company respectfully requests this Court grant a new trial on all issues.

**STATEMENT OF FACTS**

This was a civil trial of Plaintiffs' negligence claims against Defendants Bobcat Company and Leppo for personal injuries arising out of Mr. Altman's co-worker's operation of a Bobcat Model 709 Backhoe ("Model 709 Backhoe") that was attached to a Bobcat Model 863G skid-steer loader. Prior to trial, the Court granted summary judgment on Plaintiffs' strict liability claims. The matter was tried solely on Plaintiffs' remaining claims that Bobcat Company negligently designed the Model 709 Backhoe and negligently failed to equip it with appropriate warnings.[1]

**ARGUMENT**

**I. LEGAL STANDARD FOR NEW TRIAL**

Federal Rule of Civil Procedure 59 empowers this Court to grant a new trial under appropriate circumstances. As shown more fully below, the circumstances here require a new trial.

On a motion for a new trial, it is the district court's duty to ensure there is no miscarriage of justice. *Lanza v. Poretti,* 537 F. Supp. 777, 782 (E.D. Pa. 1982). A new trial should be granted where there was substantial error in the admission or exclusion of evidence; there was error in the court's instruction to the jury; there was an excessive or inadequate jury verdict; or the verdict is against the weight of the evidence. *Marder v. Conwed Corp.*, 75 F.R.D. 48 (E.D. Pa. 1977); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988); *Williamson v. Conrail*, 926 F.2 1344, 1353 (3d Cir. 1991).

---

[1] Bobcat Company has ordered the trial transcript and reserves the right to supplement this Memorandum to state the facts with record citations once all transcripts are received.

The Court has ample discretion in deciding whether a verdict is against the weight of the evidence under Rule 59. *Roebuck*, 852 F.2d at 715. *See also*, *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999). As the Ninth Circuit has explained:

> Having permitted the jury to come to its conclusion on the facts, the trial judge [has] the right, and indeed the duty, to weigh the evidence as [she] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [her] conscientious opinion, the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice.

*Fenner v. Dependable Trucking Company, Inc.*, 716 F.2d 598, 602 (9th Cir. 1993) (finding verdict was against the weight of the evidence and a new trial was required where jury failed to find plaintiff contributorily negligent, and district court judge viewed the facts to demonstrate plaintiff was at least 25% contributorily negligent).

Here, there was "substantial error in the admission [and] exclusion of evidence; error in the court's instruction[s] to the jury; [an] excessive . . . jury verdict; [and] the verdict [was] against the weight of the evidence." *Marder*, 75 F.R.D. at 54 (*citing Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940)). In addition, there was misconduct by Plaintiffs' counsel and the jury. For any one or more of these reasons, this Court should grant Bobcat Company's motion for a new trial under Rule 59.

## II. <u>BOBCAT COMPANY IS ENTITLED TO A NEW TRIAL</u>

Bobcat Company was deprived of its substantial right and ability to fairly try the disputed issues and receive an untainted verdict from the jury in the case. Not only did the Court admittedly err in allowing Plaintiffs to present certain evidence, argument, and *innuendo*, but Plaintiffs' counsel and the jury engaged in separate

instances of misconduct that, even taken alone, require a new trial. Moreover, the overall effect of these numerous errors caused cumulative prejudice and an incurable taint against Bobcat Company, rendering the entire trial improper and unfair, thereby depriving Bobcat Company of its substantial right to a fair trial.

### ***A. Juror Misconduct Improperly Prejudiced Bobcat Company and Requires a New Trial on All Issues.***

The Court found that juror misconduct occurred when Juror 73 introduced extraneous information during the jury's deliberations.[2] The misconduct improperly tainted the jury's deliberations against Bobcat Company for two reasons. First, Bobcat Company did not have the opportunity to scrutinize, present expert evidence regarding, or comment upon the information Juror 73 presented to the jury following her out-of-court experiment with Bobcat Company's product. Second, the Court applied the improper standard under Federal Rule of Evidence 606(b) in deciding the effect of that misconduct on the trial. By applying the improper standard, the Court also compelled Bobcat Company to challenge each juror's conduct, impressions, and integrity regarding the misconduct in the midst of the jury's deliberations. The jury's verdict is a result of the improper prejudice against Bobcat Company; despite all of the evidence of the confounding circumstances which resulted in the accident – including Mr. Altman's own negligence, the jury found Bobcat Company was solely responsible

[2] In fact, the Court found the misconduct so egregious it, *sua sponte*, properly ordered that Juror 73 not be paid for her service as a juror. (Tr. 4/7/08, at p. 46 l. 5; Docket No. 174).

for Mr. Altman's accident. Each of these reasons, taken independently or as a whole, leaves no doubt that Bobcat Company is entitled to a new trial.

1. The Introduction of Extraneous Prejudicial Information During the Jury's Deliberations Requires a New Trial.

It is well-established that a new trial is required when extraneous prejudicial information is introduced during a jury's deliberations. The Court found that, at the beginning and in the midst of deliberations, Juror 73 reported to the jury extraneous information about her contemporaneous out-of-court experiment with a Model 709 Backhoe[3] she found at a construction site over the weekend between closing arguments and deliberations. Upon learning of the improper introduction of extraneous information, Rule 606(b) required the Court to apply an *objective* test to determine for itself the likelihood that the improper extraneous information would affect a typical juror, rather than the subjective inquiry into the impact of the information on a particular juror that the Court erroneously performed here. Application of the *objective* test in this case establishes that the extraneous information was prejudicial to Bobcat Company, and a new trial is required.

a. Extraneous Information Was Improperly Introduced During the Jury's Deliberations, and the Court Improperly Considered the *Subjective* Impact on Jurors.

A new trial is warranted where a defendant likely suffered substantial prejudice as a result of the introduction into the jury's deliberative process of extraneous information. *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001). In considering

---

[3] The Record is unclear whether Juror 73, in fact, experimented on a Model 709 Backhoe or some other Bobcat Company backhoe model. (Tr. 4/7/08, at pp. 42-65).

whether to order a new trial, Rule 606(b)[4] permits the court to inquire into whether extraneous information was introduced. *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 394 (3d Cir. 1999). However, the court may *not* explore the *subjective* effect of that information on a particular juror's or the jury's deliberative process. *Id.* Rather, "the court must make an *objective* assessment of how the information would affect the hypothetical average juror." *Id.* (emphasis added) (internal citations omitted).

When the court's questioning of jurors goes beyond the scope permitted by Rule 606(b), the jurors' responses are not admissible and must not be considered. Instead, the court may only concern itself "with the probable effect the extraneous information would have on the hypothetical average juror, and not with the actual subjective effect the information had on [any particular juror]." *Lloyd*, 269 F.3d at 238. Indeed, reversible error occurs when a trial court effectively transfers to the jury the responsibility of determining its own impartiality by asking juror's whether exposure to extraneous information rendered them incapable of rendering an impartial verdict. *Virgin Islands v. Reuben*, 814 F.2d 134, 140-41 (3d Cir. 1987).

---

[4] In pertinent part, Rule 606(b) states, "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about … (2) whether any outside influence was improperly brought to bear upon any juror." In *United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir. 1995), the Fifth Circuit stated that Rule 606(b) bars juror testimony on "at least four topics: (1) the methods or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberations, and (4) the testifying juror's own mental process during deliberations."

Generally, courts find a jury was exposed to an improper "extraneous influence" when the jury considers facts and evidence not admitted in court at trial. *United States v. Holck*, 398 F. Supp. 2d 338, 365 (E.D. Pa. 2005). A common example of extraneous information is that which is introduced by a juror who goes out on her own, performs an experiment for the express purpose of testing the evidence, and then relays the results to the other jurors. *See, e.g., Wilson v. Vermont Castings*, 977 F Supp. 691, 695 (M.D. Pa. 1997); *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 213 (6th Cir. 1982) (concluding "the jury verdict was impermissibly tainted by what can only be characterized as an improper juror experiment . . . [which] injected extraneous information into the trial"); *Aluminum Co. of America v. Loveday*, 273 F.2d 499 (6th Cir. 1959) (affirming new trial where juror reported extraneous information to the jury following his out-of-court observation of the cattle plaintiffs claimed had been damaged); *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) ("[O]ut-of-court experiments are plainly extrinsic evidence."); *United States v. Beach*, 296 F.2d 153 (4th Cir. 1961) (setting aside jury verdict and ordering a new trial where extraneous information was introduced during deliberations when jurors performed an experiment with equipment that was not identical to that allegedly used by defendant); *United States v. Castello*, 526 F. Supp. 847 (W.D. Tex. 1981) (granting motion for new trial following juror's report to the jury of his out-of-court ballistics experiment during a weekend recess in deliberations).

A new trial is warranted here because Juror 73 improperly presented extraneous information to the jury during its deliberations. After exposure to the extraneous

information and deliberation for several hours, the jury alerted the Court of Juror 73's misconduct. The Court conducted a Rule 606(b) inquisition of the individual jurors. The undisputed evidence revealed that over the weekend, following closing arguments and before beginning to deliberate with the other jurors, Juror 73 saw what she believed to be a Model 709 Backhoe as she was driving by a construction site. Upon seeing the backhoe, Juror 73 parked her car and then climbed into the backhoe operator's seat for the express purpose of experimenting to see how comfortably and safely she fit in the operator's station, and to determine how far the Model 709 Backhoe controls would be from her if she were operating the backhoe. When she next met with the jurors to deliberate, Juror 73 presented the results of her out-of-court experiment to the other jurors, reporting that the Model 709 Backhoe operator's station design presented "tight quarters." (Tr. 4/7/08, at p. 45 ll. 18-23). There can be no question that this classic example of an out-of-court experiment by Juror 73 constitutes improper extraneous information to which the jury should not have been exposed and warrants a new trial on all issues.

Moreover, during the Court's Rule 606(b) investigation, the Court errantly went beyond permissible inquiry by exploring the *subjective* effect of the extraneous information on the individual jurors' deliberative process. As a result, the Court failed to make an *objective* assessment of how the extraneous information probably would affect the hypothetical average juror. Instead, the Court erroneously tried to gauge the *subjective* effect the information had on the individual jurors. Having considered inadmissible *subjective* testimony from this bizarre mid-deliberation *voir dire*, the Court

refused to grant Bobcat Company's motion for a mistrial. The Court's use of the improper standard under Rule 606(b), without more, warrants a new trial.

To make matters worse, as part of its improper quest for *subjective* information from each of the individual jurors, the Court put Bobcat Company's defense counsel into the awkward and extraordinary position of cross-examining the jurors who were deciding his client's fate, *during the course of their deliberations and in front of the Court, the parties and their attorneys,* to try and develop some evidence to show that the individual jurors were affected by the extraneous information. It is impossible to imagine a more prejudicial event than having one of the parties' attorneys cross-examine the jurors during jury deliberations. Undoubtedly, the jurors would discuss and consider Juror 73's conduct and their feelings over the requirement to testify about the extraneous information. The prejudicial effect presented itself a short time later when the jury delivered its verdict that Bobcat Company was not only negligent, but 100% at fault. The Court's error in creating the need for Bobcat Company's counsel to question the jurors to obtain *"subjective"* evidence in order to establish that a mistrial was warranted is, by itself, reversible error requiring a new trial.

b. Bobcat Company Was Prejudiced As a Result of the Introduction of Extraneous Information.

Prejudice against a party moving for a new trial will be presumed where the jury was exposed to extraneous information of a serious nature. *Lloyd*, 269 F.3d at 238 (citing cases). *See also, e.g., Mayhue v. St. Francis Hospital of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992) (affirming new trial where plaintiff failed to overcome presumption of

prejudice raised by jury foreman's use of dictionary to define legal terms for other jurors); *United States v. Aguirre*, 108 F.3d 1284, 1288 (10th Cir. 1997) (holding jury's use of dictionary to look-up the definition of a term relevant to defendant's alleged offense raised presumption of prejudice); *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954) ("When improper evidence, that may have prejudiced the case, has been received by the jury, the law will so presume.").

Where a presumption of prejudice does not arise, courts "must review the entire record, analyze the substance of the extrinsic evidence, and compare it to that information of which the jurors were properly aware." *Lloyd*, 269 F.3d at 239 (citing *United States v. Weiss*, 752 F.2d 777, 783 (2nd Cir. 1985)). Among the factors courts should consider in determining whether the extraneous information was prejudicial are: (1) whether the extraneous information relates to one of the elements of the case that was decided against the party moving for a new trial; (2) the extent of the jury's exposure to the extraneous information; (3) the time at which the jury receives the extraneous information; (4) the volume of credible and uncontradicted evidence properly admitted at trial that supports the jury's verdict; and (5) the length of the jury's deliberations and the structure of its verdict. *See, e.g., Reuben*, 814 F.2d 134; *Lloyd*, 269 F.3d at 239-40. However, "[w]hether a cautionary instruction to disregard extra-record information will suffice to protect the defendant's right to an impartial determination based upon record evidence depends upon the likelihood of substantial prejudice resulting form the jury's exposure to the extra-record evidence." *Reuben*, 814 F.2d at 138 (internal citations omitted).

Here, prejudice to Bobcat Company should be presumed because the extraneous information was serious in nature. The extraneous information purported to support the prima facie elements of Plaintiffs' claim that Bobcat Company negligently designed the Model 709 Backhoe – and, in particular, the Model 709 Backhoe operator's station and its backhoe controls which Juror 73 concluded following her experiment and reported to the jury had "tight quarters" – and that Bobcat Company's negligence was the sole cause of Plaintiffs' injuries.

Even if prejudice is not presumed, prejudice exists because consideration of the above factors establishes prejudice existed in fact. First, Juror 73's presentation of the findings of her out-of-court experiment bear directly on whether Bobcat Company was negligent in its design of the Model 709 Backhoe, and, in particular, the operator's station and its controls. Second, all jurors drank the poisonous extraneous elixir gathered and relayed by Juror 73 from her out-of-court experiment. Third, the jury barely had adequate time to consider the evidence presented at trial before Juror 73 first presented her extraneous experiment results. Fourth, Bobcat Company presented credible and uncontradicted evidence that Mr. Altman was contributorily negligent for his injuries. Fifth, prejudice to Bobcat Company is shown by the timing of the verdict. Note One revealed an early afternoon question of a serious nature about the jury's obligation to assign negligence to the Bobcat Company, Plaintiff, Mr. Altman, and First Energy. Relatively quickly after the Court received Note Two and the Rule 606(b) inquiry was completed, the jury returned its verdict. Finally, the prejudice against

Bobcat Company is inherent in the jury's verdict. In spite of all of the foregoing, the jury found Bobcat Company 100% liable for Mr. Altman's accident.

In short, the extraordinary presentation of extraneous information through juror misconduct, which in and of itself required a new trial, unfairly prejudiced Bobcat Company. The prejudice was compounded by the Court's use of an improper standard for subjectively evaluating the effect of the information, which required the even more extraordinary cross-examination of jurors by Bobcat Company's counsel during the jury's deliberations. For any one or more of these reasons, Bobcat Company is entitled to a new trial.

***B. The District Court Erred in Admitting Improper Prejudicial Evidence.***

A new trial is warranted when a court admits evidence in contravention of the Rules of Evidence and, thereby, unfairly prejudices a party. Here, Plaintiffs were permitted to repeatedly present to the jury irrelevant, highly prejudicial, and undisclosed evidence in violation of the Federal Rules of Evidence. First, it was prejudicial error to permit Plaintiffs to attack Bobcat Company's credibility with improper and inadmissible evidence through presentation of a discovery sanction issued by a Washington State court over 25 years earlier in *Gammon v. Clark Equipment Co.*, 686 P.2d 1102 (Wash. App. 1984). Second it was prejudicial error to allow Plaintiffs to introduce into evidence Bobcat Company counsel's objections to Plaintiffs' objectionable requests to admit. Third, it was prejudicial error to permit Plaintiffs to play for the jury a computer-generated-animation video recreating a “dramatization” of the accident. Lastly, it was prejudicial error to permit Plaintiffs' proffered expert,

Christopher Ferrone, to testify at all; he did not qualify as an expert under *Daubert*. Further, once he did testify, he was erroneously permitted to testify on topics not disclosed in his report, at his deposition, or elsewhere. The Court's instructions cured none of these errors, and each of these errors was so substantially prejudicial to Bobcat Company that a new trial is required.

1. The District Court Erred in Allowing Plaintiffs to Impeach Bobcat Company and Its Witness, Tom Ihringer, with Improper Character Evidence and Improper Evidence of Other Acts.

At their core, the Federal Rules of Evidence prohibit the admission of evidence that is substantially more prejudicial than prohibitive. Fed. R. Evid. 403. Rule 404 exemplifies this core value by prohibiting use of specific instances of prior conduct "to prove the character of a person in order show action in conformity therewith." Similarly, Rule 608 prohibits the admissibility of character evidence through extrinsic evidence. Here, Plaintiffs' use of the discovery issues involved in the unrelated, irrelevant *Gammon* matter violated these Rules and unfairly and seriously prejudiced the jury against Bobcat Company.

a. Plaintiffs' Use of *Gammon* Was Improper and Prejudicial Character Evidence.

Plaintiffs improperly used evidence of a discovery dispute in an outdated and unrelated case to impeach the credibility of Bobcat Company and its corporate witness, Product Safety Manager Tom Ihringer. This evidence was but one specific instance of prior conduct – not to mention an instance that was old, unrelated, and irrelevant. Nonetheless, Plaintiffs used the specific instance of prior conduct as extrinsic character

evidence. Rules 404(b) and 608 prohibit such use. Thus, Bobcat Company was unfairly and seriously prejudiced.

The Court erroneously permitted Plaintiffs' counsel to interrogate Mr. Ihringer about a discovery dispute that occurred in *Gammon v. Clark Equipment Co.*, 686 P.2d 1102 (Wash. App. 1984). *Gammon* was a case in a Washington State court more than 25 years ago involving skid-steer loader equipment -- which is not even at issue here. The *Gammon* judge sanctioned Clark Equipment because it found, under the Washington State rules existing at that time, that Clark Equipment's Washington attorneys took an inappropriate discovery position on the production of "other accidents" with other skid-steer loaders. *Gammon*, 686 P.2d at 1106-07.

Unlike the circumstances in *Gammon*, here, Plaintiffs did not (and could not) establish there was any dispute regarding Bobcat Company's discovery responses about similar accidents involving the Model 709 Backhoe. There was no such dispute. Also unlike *Gammon*, this case involves different equipment, under different circumstances, and an accident occurring 25 years later. Thus, Plaintiffs' use of *Gammon* served merely to confuse, distract, and mislead the Court and jury, causing substantial prejudice to Bobcat Company in violation of the Federal Rules. *See, e.g., Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 524 (3d Cir. 1997) (holding trial witness testifying as corporate designee may not be impeached with the crimes of his employer). *See also, Jinks-Umstead v. England*, 2005 U.S. Dist. LEXIS 34547, No. 99-2691, *6-*7, *13 (D.D.C. Dec. 7, 2005) (refusing to instruct jury or permit plaintiff to introduce evidence of discovery dispute in prior related trial between the parties because the instruction would have

been "extremely prejudicial" to defendant, and the evidence improperly would have turned the trial into a case about discovery, and defendant had already "paid its dues" for the earlier violations); *Hamm v. NYC Office of the Comptroller*, 1999 U.S. App. LEXIS 26244, No. 99-7339 (2nd Cir. Oct. 14, 1999) (affirming trial court's refusal to permit plaintiff to introduce evidence of defendant's alleged discovery abuses because they were irrelevant to plaintiff's claim); *Richardson v. Union Oil Co.*, 170 F.R.D. 333, 334 (D.D.C. 1996) (refusing to permit plaintiff to present evidence at trial regarding discovery misconduct because it "would . . . serve no remedial purpose . . . [and] has the potential for creating a distracting and confusing side-issue which would only divert the jury from its main task").

Ultimately, this Court found Plaintiffs should not have questioned Mr. Ihringer about *Gammon*. The Court attempted to cure the error by issuing an instruction to the jury. However, as stated in Bobcat Company’s Motion for Mistrial, not even a well-crafted elaborate instruction could cure the serious prejudice to Bobcat Company's case and its witnesses – especially a major part of Bobcat Company's defense demonstrating there were no other substantially similar accidents, claims or lawsuits in the prior 9,000,000 hours of field use with the Model 709 Backhoe. Moreover, the instruction the Court gave was insufficient. The related instruction was buried beneath another instruction regarding *another* instance of Plaintiffs' improper impeachment of Mr. Ihringer. More importantly, the instruction was fundamentally inadequate because *it failed to instruct the jury to disregard the improperly admitted evidence.* (Tr. 4/4/08, at pp. 24-25, ll. 18 to 5). While the Court eventually recognized its error in permitting

Plaintiffs' use of *Gammon*, by that time the damage had been done. No instruction, including the inadequate one given by the Court, could or did repair the extreme prejudice to one of the pillars of Bobcat Company's defense, namely, that Bobcat Company had no notice that their design of the backhoe control levers negligently created a potential for injury from unintended activation of the levers.

b. Plaintiffs Used *Gammon* as Evidence of Improper "Bad Acts" or "Other Acts" Evidence in Violation of the Federal Rules.

Generally, a proponent may not proffer evidence of acts not at issue to prove liability in a case before the court. Fed. R. Evid 404(a) and (b), 608. The Third Circuit has held that such "evidence is admissible only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar." *Barker v. Deere and Co.*, 60 F.3d 158, 162 (3d Cir. 1995) (citing cases). In order to determine whether the accidents occurred under substantially similar circumstances, the court "must be apprised of the specific facts of previous accidents." *Id.* at 163. Without that foundation, it is impossible for the Court to make a determination. *Id.*

Plaintiffs cannot establish any similarity between the *Gammon* accident and Mr. Altman's accident, nor can they establish any similarity between the discovery dispute in *Gammon* and any discovery dispute here. Indeed, Plaintiffs did not even try. Instead, Plaintiffs failed to disclose in advance of trial anything related to *Gammon* until both the Court and Bobcat Company would be least prepared and most prejudiced; Plaintiffs waited until Mr. Ihringer's cross-examination at trial. Even then, Plaintiffs failed to

apprise the Court of the specific facts of the *Gammon* accident or otherwise lay a foundation for the evidence, thereby preventing the Court from making the required evaluation and ruling on the admissibility of the evidence. As a result, despite pretrial rulings that prevented introduction of "other accident" evidence, Mr. Hartman's cross-examination of Bobcat Company's key defense witness exposed the jury to the irrelevant, misleading, and highly prejudicial series of events which transpired in a Washington State court more than two decades ago. In the process, Plaintiffs' counsel circumvented the prohibition against "other accident" evidence. *Cf. Barker*, 60 F.3d at 163 (finding plaintiff failed to establish relevance of admitted evidence and "[a]ll of the evidence of prior tractor accidents that was introduced as direct evidence of a design defect should have been excluded as irrelevant pursuant to Rule 402"). These circumstances epitomize prejudice and, by themselves, require a new trial.

2. The District Court Erred in Allowing Plaintiffs' Computer-Generated Animation Video Dramatization

The Court erred in allowing Plaintiffs' to show their computed-generated animation ("CGA") video to the jury.

a. The Contents of Plaintiffs' CGA.

In an unusual oxymoron, Plaintiffs' contended their CGA was *not* intended to re-enact the accident – instead, they claimed, *it was "a dramatization*." Pictures are worth a thousand words, and a CGA, an animated serious of thousands of digital pictures, speaks tens of thousands of words. The very first animated sequence in Plaintiffs' CGA

shows their true motive of hoodwinking the jury with a "dramatized" re-enactment of Mr. Altman's accident.

The entire CGA is in the record, but a "screen shot" taken from the first animated sequence shows:




This "screen shot" taken from the first animated segment of Plaintiffs' CGA indisputably shows Plaintiffs' attempt to depict a dramatized re-enactment of the accident. They are depicting the Model 709 Backhoe as designed by Bobcat Company and used by First Energy, by showing a backhoe operator remarkably resembling Mr. Muscarella turning to his right and inadvertently contacting the backhoe "boom" control lever with his left knee, as he supposedly did when he hit Mr. Altman.

b. Evidentiary Requirements for CGA

Federal courts have recognized the persuasiveness of CGA and the importance of its timely disclosure since CGA's inception in the mid-1990's:

> [Defendant] had not received timely notice of plaintiff and Jones' intention to use computer animation with the filing of the pretrial order. [Defendant] has thus been severely prejudiced in its ability to respond to the credibility, reliability, accuracy and materiality of this evidence. Additionally, this type of evidence can be highly influential upon a jury, well beyond its reliability and materiality, due to its documentary-type format presented in a "television" like medium. Additionally, we believe that computer animation evidence, by reasons of its being in a format that represents the latest rage and wrinkle in video communications and entertainment, may well have an undue detrimental effect on other more reliable and trustworthy direct-type evidence. We conclude this evidence has been untimely brought into the case, and thus should be excluded. We also find this evidence as being excludable under Fed. R. Evid. 403 by reasons of its great potential for being misleading and prejudicial.

*Van Houten-Maynard v. ANR Pipeline Co.*, 1995 U.S. Dist. LEXIS 7046, *37-38 (N.D. Ill. May 19, 1995).

Federal district courts in the Third Circuit recognize the same CGA dangers:

> Relying upon the old adage, "seeing is believing," we conclude that the jury may give undue weight to an animated reconstruction of the accident. . . . It would be an inordinately difficult task for the plaintiff to counter, by cross-examination or otherwise, the impression that a computerized depiction of the accident is necessarily more accurate than an oral description of how the accident occurred. Because the expert's conclusion would be graphically depicted in a moving and animated form, the viewing of the computer simulation might more readily lead the jury to accept the data and premises underlying the defendant's expert's opinion, and, therefore, to give more weight to such opinion that it might if the jury were forced to evaluate the expert's conclusions in the light of the testimony of all the witnesses, as generally occurs in such cases.
>
> Based upon our conclusion that the relevance of the computer animation is outweighed by the danger of confusion and prejudice, we will grant plaintiff's motion to preclude the computer simulation.

*Racz v. R.T. Merryman Trucking, Inc.*, 1994 U.S. Dist. LEXIS 4393, *5 (E.D. Pa. Apr. 4, 1994).

The inherent risks of a CGA are the likelihood it will confuse the jury, the likelihood a testifying witness will use the CGA to reinforce or bolster otherwise unreliable testimony, and the likelihood that even a minor deviation between the animation will mislead the jury on the actual events or conditions relating to the claims or defenses. Fed. R. Evid. 403; *Robinson v. Missouri Pacific Railroad*, 16 F.3d 1083, 1089 n.7 (10th Cir. 1994) (noting court must consider Rule 403 in allowing animation type evidence and excluding simulation evidence); *Fusco v. General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993) (excluding evidence of accident replication); *In re TMI Litigation*, 911 F. Supp. 775, 798-99 (M.D. Pa. 1996) (excluding demonstration movie and model testimony).[5] In addition, if the CGA is offered to support an expert's testimony, then the proponent of the CGA must demonstrate that the CGA is scientifically reliable enough for the expert to rely upon. *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir. 1994).

The bottom line is that federal courts recognize a CGA can have enormous powers of persuasion and, therefore, very carefully review a CGA for proper

---

[5] *See also, Commonwealth v. Serge*, 586 Pa. 671, 896 A.2d 1170, 1179 (2006) (Pennsylvania Supreme Court requires computer-generated animation "must be weighed by the same criteria of admissibility; namely, probative value versus prejudicial effect to which all other evidence is subject."). In *Commonwealth v. Serge*, the Court required consideration of "new factors" for this type of computer-generated animation, including the additional dangers and benefits this type of evidence presents as compared with more traditional demonstrative evidence. *Id.* at. 685, 1179.

authentication. If a CGA is offered to support an expert's opinion, courts insure that it meets the standards for scientific reliability. If the CGA passes muster, courts then filter the CGA through the separate Rule 403 screen and very carefully consider whether the probative value outweighs its inherent danger of confusion and prejudice.

c. Plaintiffs' CGA Violated the Federal Evidentiary Requirements.

Plaintiffs met none of the three requirements. Plaintiffs offered no authentication whatsoever for its CGA – which their counsel described as a "dramatization." Although their testifying expert ushered in the CGA during his testimony, that expert did not prepare the CGA and Plaintiffs never explained who did prepare the CGA. (Tr. 4/2/08, at p. 160 ll. 7-3). Plaintiffs' expert admitted the CGA had been prepared just the week before trial, and Plaintiffs produced the CGA to the Defendants less than 48 hours before the trial started, depriving Defendants of any real opportunity to discover who created the CGA; what data, dimensions, and computer program were used to create it; who validated the data and the computer's finished product as demonstrated in the CGA; and whether the CGA was created to an acceptable engineering scale. (Tr. 4/2/08, at pp. 103-104 ll. 18-10; pp. 152-155 ll. 16-6). Given that sandbagging, Defendants had no shot at the "inordinately difficult task . . . to counter, by cross-examination or otherwise, the impression that a computerized depiction of the accident is necessarily more accurate than an oral description of how the accident occurred." *Racz*, *supra*, *14. In fact, the only foundation evidence Plaintiffs offered was that their CGA showed the Model 709 Backhoe boom moving 50% faster than it did during Mr.

Altman's accident – which simply exacerbated the deception and drama that was the CGA.

Although the CGA was ushered in by their expert to "take the [proposed] design features . . . and place them on this product and show a dramatization of how this happened . . ." (Tr. 4/2/08, at p. 153 ll. 13-17), Plaintiffs expert (who was not qualified as an accident reconstruction expert) never established the CGA was scientifically sound enough for an expert to rely upon. As noted above, the only foundation Plaintiffs adduced from their expert undermined its use; Mr. Ferrone testified the CGA dramatization depicted an *inaccurate* and faster speed for the backhoe boom than what the Model 709 was even capable of. That is exactly the type of inaccurate data that Rule 702 prohibits experts from relying upon.

Finally, the Court failed to make any determination pursuant to Rule 403 that the CGA's probative value outweighed its inherent danger of causing confusion and prejudice. Because Plaintiffs did not produce the CGA to the Defendants until less than 48 hours before the start of the trial, the Court did not have the opportunity to review the CGA before it made its ruling and, instead, was forced to rely on Plaintiffs' counsel's characterization of its contents. To make matters worse, the Court then gave the jurors a conflicting, confusing instruction, just before they saw Plaintiffs' CGA:

> I'm going to allow the animation. It's brief. The jury understands it is not an accident reconstruction. Please understand that. It's just to show inadvertent contact with the controls.

(Tr. 4/2/08, at pp. 154-55 ll. 24-3). Not only was the Court's instruction incorrect, but it advised the jury that the CGA demonstrated how "inadvertent contact with the

controls" had occurred. Seconds later, the jury saw the promised CGA showing the seated Model 709 Backhoe operator turning to his right and accidentally hitting the bottom of the backhoe boom control lever with his left knee. No matter what that CGA is called, it *is* a reconstruction of an accident, the very accident Plaintiffs were trying to prove resulted in their damages. Even worse, the CGA was a "dramatized" reconstruction of an accident neither the Court nor Bobcat Company had adequate opportunity to consider, scrutinize, or challenge.

In the absence of an adequate foundation that a CGA bears a substantial similarity to the event it attempts to depict, courts will not allow a CGA into evidence – especially given the stricter scrutiny that must be applied to these exhibits which can have unfairly persuasive effect. *See, e.g. Friend v. Time Manufacturing Co.*, No. CIV 03-343 2006 U.S. Dist. LEXIS 52790, *22 (D. Ariz. Jul. 28, 2006) (excluding CGA showing plaintiff using the allegedly defective product); *Bledsoe v. Salt River Valley Water Users' Ass'n.*, 179 Ariz. 469, 880 P.2d 689, 692-93 (Ct. App. Div. 2 1994) (excluding CGA of accident where "plaintiffs' counsel failed to satisfy even minimal foundation requirements for the [CGA]"); *Smith v. Kansas City Southern Ry. Co.*, 846 So.2d 980 (La Ct. App. 3d Cir. 2003) (excluding CGA of where information inputted into CGA program was different than for actual accident); *Sommervold v. Grevlos*, 518 N.W.2d 733 (S.D. 1994) (excluding CGA from accident reconstructionist because the reconstruction not similar enough to the actual accident conditions). Here, because Plaintiffs' CGA was an accident reconstruction – as opposed to an animation which simply depicts a generally accepted scientific principle – Plaintiffs were required to lay a proper

foundation to show that their accident reconstruction was "substantially" similar to Mr. Altman's accident. *Fusco v. General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993). Plaintiffs failed. As a result, there was no way of knowing whether the operator depicted in the CGA has the same anthropomorphic dimensions as Mr. Muscarella or whether Mr. Muscarella was sitting in the same position as the operator was in the CGA – that is, with his body pulled to the front edge of the backhoe seat, towards the backhoe controls in front of him, and in the opposite direction from the machine's controls for which he reached with his hand. For these reasons, the Court should have excluded the Plaintiff's CGA "dramatization," and committed reversible error by admitting it.

3. Plaintiffs' Use of Bobcat Company Counsel's Discovery Objections to Plaintiffs' Requests for Admission Was Improper and Substantially Prejudicial.

Bobcat Company moved for a mistrial following Plaintiffs' improper reference to non-evidentiary objections made by Bobcat Company's counsel in response to Plaintiff's poorly-worded Rule 36 requests for admission. Specifically, Plaintiffs propounded certain requests that Bobcat Company admit certain facts relating to the "operation" of the Bobcat Company machine, and Bobcat Company's counsel objected in writing to those requests on several grounds, including that Plaintiffs had not defined what they meant by "operation" and that Plaintiffs' use of that word, in the context of the Rule 36 requests, was vague and ambiguous. Plaintiffs never filed a motion to compel or strike the objections, nor did Plaintiffs otherwise reply to the objections. Instead, Plaintiffs ambushed Bobcat Company in front of the jury and the Court when they attacked Mr.

Ihringer with the legal objection to Plaintiffs' poorly-crafted requests to admit lodged by defense counsel.

Black letter law holds that objections of counsel do not constitute substantive evidence, do not constitute "judicial admissions" by the party, and do not constitute statements of the party for impeachment purposes. *See, e.g.*, Tr. 3/31/08, at pp. 8-9 (Court's opening instructions to the jury). *See also, Taylor v. The Allis-Chalmers Mfg. Co.*, 320 F. Supp. 1381, 1385 (E.D. Pa. 1969) (excluding counsel's statements in pretrial memorandum was not error and did not prejudice plaintiff in presenting its case); *Childs v. Franco*, 563 F. Supp. 290 (E.D. Pa. 1983) (holding, "the scope of judicial admissions is restricted to matters of fact which would otherwise require evidentiary proof. It does not include statements of counsel of his or her conception of the legal theory of the case."); *U.S. v. Cottrell*, No. 85-00024, 1986 U.S. Dist. LEXIS 19272 (E.D. Pa. Oct. 9, 1986). A request for a conclusion of law is not the proper subject of a request for admission and not proper impeachment material. *Arredondo v. Flores*, 2007 U.S. Dist. LEXIS 76835 (S.D. Tx. Oct. 16, 2007). A witness may not be impeached with inadmissible evidence. *In re Hanford Nuclear Reservation Litigation*, 497 F.3d 1005, 1029-1030 (9th Cir. 2007).

The day after the improper impeachment by Plaintiffs' counsel, the Court recognized the error, ruled the impeachment was improper, and instructed the jury that the response made by Bobcat Company and its attorneys were "legal arguments" and should not be considered a "prior inconsistent statement." (Tr. 4/4/08, at p. 24 ll. 9-17). This instruction failed to cure Plaintiffs' inappropriate use of the responses and

objections (not merely "legal arguments"), and impermissibly allowed the jury to continue to infer Bobcat Company and Mr. Ihringer should be afforded less probative weight on the issue of "operation" based on Mr. Hartman's poorly-drafted requests.

4. The Court Erred in Allowing Plaintiffs' Expert, Christopher Ferrone, to Testify Because He Was Neither Qualified Nor Competent and He Testified Regarding Issues Not Disclosed in His Report.

Prior to trial, Bobcat Company moved to preclude Plaintiffs from presenting the testimony of Christopher Ferrone, a witness Bobcat Company argued was incompetent and unreliable under Rule 702 and the *Daubert* progeny. Bobcat Company reasserts those grounds here.

In addition, the Court erred in allowing Mr. Ferrone to testify – much to Bobcat Company's surprise – about human reaction time, a topic completely absent from Mr. Ferrone's report. In fact, Mr. Ferrone's report lacked any engineering standards and demonstrated a complete lack of qualification to opine on the Model 709 Backhoe at all. Mr. Ferrone's lack of knowledge and expertise was solidified during his deposition by Bobcat Company, when Mr. Ferrone failed to even mention human reaction times as a component of his opinion.

The error in allowing Mr. Ferrone to testify at all, let alone outside the scope of the his report, was compounded by the Court's refusal to permit Bobcat Company's expert to testify outside the scope of his report. *Bowersfield v. Suzuki Motor Corp.*, 151 F. Supp. 2d 625, 631 (E.D. Pa. 2001) (noting an expert may go beyond the scope of his report where no claim of surprise or bad faith exists). When Bobcat Company's expert

began to refute Mr. Ferrone's testimony regarding human reaction time, the Court ruled he could not go outside his report, thereby denying Bobcat Company the opportunity to rebut Mr. Ferrone's improper testimony. (Tr. 4/3/08, at pp. 65-70).

***C. The District Court Erred in Instructing the Jury.***

Without question, a court should insure that the instructions do not confuse the jury, *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984), and a new trial should be granted in circumstances where the jury has disregarded a court's instruction, *Chicago Ry. Co. v. Speth*, 404 F.2d 291 (8th Cir. 1968). Considering the extraordinary trial events and the jury's ultimate verdict, it is clear that the instructions provided at each phase of the trial failed to properly compel the jury to discharge its duty to the Court and the parties.

"[W]hile there may be situations in which a trial judge may decline to answer questions put by the jury, when a jury returns on its own motion indicating confusion, the trial court has the duty to give such additional instructions on the law as the court may think necessary to clarify the jury's doubt or confusion." *Scarborough v. Lewis*, 359 Pa. Super. 57, 70-71, 518 A.2d 563 (Pa. Super. 1986) (clarifying confusion in face of jury's demonstrated confusion over contributory negligence charge) (*citing Worthington v. Oberhuber*, 419 Pa. 561, 563, 215 A.2d 621 (1966)). *See also, Price v. Glossom Motors Lines, Inc.*, 509 F.2d 1033 (4th Cir. 1975) (finding trial court's failure to respond correctively to the jury's confusion regarding plaintiff's contributory negligence reversible error).

Here, the Court failed to respond correctively when it gave an inaccurate and confusing instruction. Because this was exclusively a negligence case, the written

instructions specifically told the jurors that the issue was Bobcat Company's negligence, "meaning Defendant Bobcat's *conduct* in designing, creating and distributing a product, rather than the degree of perfection of the product itself." (Tr. 4/7/08, at pp. 18-19, ll. 25-4) (emphasis added). Nonetheless, when responding to Note One, the Court incorrectly instructed the jury that

> First Energy is not a defendant in this case. The defendants are Bobcat Company and the Leppo defendants. Bobcat has been sued in two respects; first, for a negligent design, *an alleged design defect* in the backhoe. Both Bobcat and Leppo have also been sued on a failure to warn and/or train.

(Tr. 4/7/08, at p. 41, ll. 14-16) (emphasis added). It is difficult to tell from the transcript whether the Court actually said "and an alleged defect" or was trying to define negligent design as a "design defect." Either reading reveals an improper instruction, advising the jury it could find Bobcat Company liable either for negligently designing the product or because of an "alleged design" defect. That errant instruction alone entitles Bobcat Company to a new trial.

***D. Plaintiff's Counsel Improperly Argued to the Jury.***

It is highly unjust and prejudicial for a party to suffer an adverse verdict at the hands of its opponent's misconduct. Further, a new trial is warranted when counsel refers to evidence ruled inadmissible at the pretrial conference. *Brown v. Royalty*, 535 F.2d 1024 (8th Cir. 1976).

Here, Plaintiffs' counsel improperly attacked Bobcat Company's counsel with offensive accusations. Plaintiffs' counsel's conduct constitutes reversible error. *See., e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992). Plaintiffs'

counsel closing argument improperly and prejudicially discussed the improperly admitted evidence discussed above, as well as material that was not admitted into evidence at trial. First, counsel argued that the jury should be a mini-consumer protection agency. (Tr. 4/4/08, at p. 64 ll. 16-20) ("[I]f someone is slightly confused about their instructions, think of all the accidents that can occur."); (Tr. 4/4/08, at p. 70 ll. 20-24). *Cf. Barker*, 60 F.3d at 163 & 165.[6] Second, counsel improperly criticized Bobcat Company's counsel for withholding documents based on attorney-client privilege.[7] Third, counsel misstated the law, essentially turning the case into a strict liability action. (*See, e.g.*, Tr. 4/4/08, at p. 69 ll. 11-23) ("Their duty is to make is as safe as they can. . . . They have a duty to make it right."). Fourth, counsel made inappropriate comments that Tom Ihringer and Carman Lynnes "have no credibility." (Tr., 4/4/08, at 56 ll. 24-25); (*see also*, Tr., 4/4/08, at p. 4 ll. 3-15). Fifth, counsel discussed the "near misses" that

---

[6] "Finally, we are also troubled by additional inflammatory comments made by Barker during opening statements and closing arguments regarding Deere's alleged inaction in the face of documented injuries/deaths." *Barker*, 60 F.3d at 165.

[7] "Again, let's talk about credibility. You heard about after the accident how First Energy went out and really tried to fix things, come up with a whole bunch of ideas and how all of the Pooh-Bahs at Bobcat that were important, Mr. Ihringer, the main Pooh-Bah, sat together and had conferences. Conferences with Mr. Weyrick**. First of all, credibility. You may recall this exchange of questioning. Do you have notes of those conferences? Yes. Is this -- I show him the note. Is this the only note? No. I gave them to my attorney. Sir, to Mr. Gesk? Where are the notes? Attorney/client privilege. Oops.** That's -- those are the notes, the one I have. Then I have to go back up to the man and say, well, what date does this note represent? One day.

I think we all know the difference between a phone call and a conference. And I think we all know the difference when somebody is shoveling it and when somebody is not. There's no place for that in this courtroom. There's no place for anything less than candor. There's no place for misdirection. There's no place for anything other than presenting the very best evidence and allowing you to make the decision."
(Tr. 4/4/08, at pp 65-66 ll. 23-18) (emphasis added).

were not in evidence (Tr. 4/4/08, at p. 70 l. 25), despite the Court's clear instruction and pretrial ruling on this point (Docket No. 153, Order, 3/7/08). Sixth, counsel remarked "I don't spend time and money on a bad case." (Tr. 4/4/08, at pp 54-55 ll. 25-9). Seventh, counsel referenced a training video that was not in evidence and the subject of which was the danger of unintended activation of a Bobcat Company "Tractor Loader Backhoe," a different type of equipment than that involved in Mr. Altman's accident. (Tr. 4/4/08, pp. 74-75 ll. 25-11). Eighth, counsel improperly solicited the jury's emotions when he argued for a "substantial" reward because Plaintiffs would not be able to return to Court.[8] This was a clear plea to award damages for future medical bills without any evidence and a further plea to award damages to save Plaintiffs' marriage. (Tr. 4/4/08, at p. 92 ll. 4-7). Last, but not least, Plaintiffs' counsel improperly commented on Bobcat Company's supposed inaction following the Mr. Altman's accident. Such conduct has been admonished by this very Court under similar circumstances.[9] *Cf. Barker*, 60 F.3d at 165, 167 (ordering new trial due to the improper introduction of other accident evidence by Plaintiffs' counsel here, Mr. Hartman).

---

[8] "I have fulfilled my duty. I have proven what I am supposed to prove. Now it's up to you to go back and do your duty. If you do your duty, based on your sworn oath, you will come back and give Mr. and Mrs. Altman a very substantial award compensating them for the rest of their lives because if Mr. Altman has additional medical expenses that weren't anticipated that we couldn't put up there because we don't know, he can't come back. If he gets way worse, he can't come back and say, hey, guys, I need more. There's nothing there for future medical expenses. This is his day in Court. And this is their day in court. This is the time for you to establish their responsibilities to Mr. Altman." (Tr. 4/4/08, at pp. 92-93, ll.18-4).

[9] In *Barker*, the Circuit Court stated, "Finally, we are also troubled by additional inflammatory comments made by Barker during opening statements and closing

Attorney misconduct is grounds for a new trial where there is a "reasonable probability" that conduct, such as making prejudicial statements, influenced the verdict. *Fineman*, 980 F.2d at 206-07; *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (reversing denial of motion for mistrial and explaining, "[a]lthough we are always reluctant to grant a mistrial because of counsel's prejudicial statements when the district court has declined to do so, we nevertheless conclude that the closing argument here, when considered in its entirety, was so constantly and effectively addressed to the prejudices of the jury that we must order a new trial."); *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005). To make its determination, a court must examine the totality of the advocate's remarks and determine whether he or she gave the jury an improper basis for the imposition of liability or damages:

> The long-recognized standard in this circuit for granting a new trial based on improper conduct by counsel was established in Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978) in which the Court of Appeals stated that a court must place "restraints against blatant appeals to bias and prejudice." A trial judge must determine where advocacy ends and appeals to bias and prejudice begins by examining the "cumulative thrust of Plaintiff's counsel's argument.

*Ballarini*, 841 F. Supp. 662 at 666) (internal citations omitted) (granting defendant's motion for new trial based on attorney misconduct in arguments to jury).

Here, counsel's introduction of extraneous matters during closing argument requires the Court to grant a new trial. *See, e.g., Ballarini v. Clark Equipment Co.*, 842 F. Supp. 662, 667 (E.D. Pa. 1993) (granting new trial after considering the cumulative effect

---

arguments regarding Deere's alleged inaction in the face of documented injuries / deaths." *Barker*, 60 F.3d at 165.

of plaintiff counsel's tactics and the tangible improper impact on the jury); *Falkowski v. Johnson*, 148 F.R.D. 132 (D. Del. 1993). Plaintiffs' counsel made several statements that, without more, require a new trial; the statements were the result of counsel's blatant attempt to inject improper bias and prejudice into the jury's deliberations.

***E. The Jury's Verdict Was Against the Weight of the Evidence.***

A court should grant a new trial where the verdict is contrary to the weight of the evidence and a miscarriage of justice would result if the verdict were to stand. *Brennan v. Norton*, 350 F.3d 399, 430 (3d Cir. 2003). The jury's verdict here is contrary to the weight of the evidence in three respects, any one of which requires a new trial.

1. <u>The Jury's Failure to Assign Contributory Negligence to Plaintiff Mr. Altman Is Against the Weight of the Evidence.</u>

A court may award a new trial where the jury ignored competent evidence supporting the plaintiff's contributory negligence. *Koerner v. Club Medititererranee, N.A.*, 833 F. Supp. 327 (S.D.N.Y. 1993); *Vizzini v. Ford Motor Co.*, 569 F.2d 754 (3d Cir. 1977); *Fenner*, *supra*. The jury's failure to attribute even 1% responsibility to Mr. Altman is a clear sign that they completely ignored the evidence of his contributory negligence.

The trial evidence clearly established Mr. Altman's contributory negligence in failing to guard his own safety, including his decision to stand in the swing radius of the Model 709 Backhoe while Mr. Muscarella was using it to excavate. The trial evidence demonstrated that Mr. Altman was careless for not paying attention. Mr. Altman received training that confirmed that job sites can be very dangerous to workers and bystanders, especially those around equipment and electricity. Mr. Altman

disregarded the work rule cautions set forth in Section 101.1 of First Energy's safety manual. Mr. Altman had been warned to be careful; he was new to the job; he had never before been at a job site where a backhoe was in operation; and he chose to stray away from Mr. Sagulla's side as instructed. Instead of following the mandates of his safety training, Mr. Altman wandered from Mr. Sagulla, stood in the backhoe's swing arm radius with the machine's engine running, chose not to watch the backhoe, never saw or heard the backhoe move in the more than three seconds between the time Mr. Muscarella allegedly bumped the control and when Mr. Altman was hit by the backhoe boom, never ducked or stepped aside to avoid the backhoe boom, and did nothing to protect himself from the known danger close at hand. With all of this, it is hard to fathom a more careless method used by someone new to the job.

In addition, in their Note One, the jury articulated its confusion in its authority or obligation to assign relative fault among Mr. Altman, Bobcat Company, and non-party First Energy. Even if the Court had not erred in its responsive instruction, the clear import of Note One is that the entire jury intended to allocate at least some fault to Mr. Altman prior to revealing Juror 73's misconduct. The jury's inclusion of First Energy as part of its negligence question to the Court further reveals unresolved confusion over its task. It is irrelevant whether the jury's ultimate failure to allocate fault to Mr. Altman or find First Energy's conduct to be a superseding cause was a result of their confusion, Juror 73's misconduct, or the jury's complete disregard of the evidence of Mr. Altman's negligence. The jury's verdict that Mr. Altman was not even

1% liable is against the manifest weight of the evidence, and a new trial should be granted on that ground alone.

2. The Jury's Finding that Bobcat Company Negligently Designed the Backhoe Is Against the Manifest Weight of the Evidence.

Because the Court had already dismissed their strict liability claims, Plaintiffs were limited to trying a negligence case and, therefore, required to demonstrate that Bobcat Company had negligently designed the Model 709 Backhoe. However, Plaintiffs failed to present evidence on all of the elements of negligent design. In fact, Plaintiffs presented no evidence at all regarding Bobcat Company's *conduct* in designing the Model 709 Backhoe.

In addition, evidence of the absence of prior accidents is relevant in negligent design cases and to show the non-existence of the claimed design negligence, that the injury was not caused by the claimed design negligence, that the situation was not dangerous, and that the manufacturer did not possess requisite notice. *Koloda v. General Motors*, 716 F.2d 373, 375 (6th Cir. 1983); *see also, Vizzini v. Ford Motor Co.*, 569 F.2d 754 (3d Cir. 1977). Yet, Plaintiffs did not introduce any admissible evidence to contradict Mr. Ihringer's testimony that Bobcat Company did not receive any reports of other substantially similar accidents, despite 9,000,000 hours of field use of 17,000 Model 709 Backhoes and other similar Bobcat Backhoe equipment that had been manufactured and sold since the early 1990's. The uncontroverted evidence showed that no similar accidents had occurred in the 9,000,000 hours of field usage before Mr. Muscarella hit

Mr. Altman. As a result, Bobcat Company did not and could not have had any prior notice of the alleged negligent design.

In the absence of any evidence of Bobcat Company's negligent conduct in designing the product and the presence of uncontroverted evidence that Bobcat Company had no notice of any deficiency in their design, the jury's finding that Bobcat Company negligently designed the Model 709 Backhoe is against the manifest weight of the evidence, and the Court should grant Bobcat Company's request for a new trial.

3. The Jury's Failure to Reduce Its Damage Award to Conform to the Evidence that Plaintiff Could Return to Some Work Was Against the Manifest Weight of the Evidence.

All of the medical experts testified Mr. Altman maintained a residual ability to perform some level of work. In fact, Plaintiffs' own economist testified that Mr. Altman could return to work and had a residual earning capacity despite his injury. As a result of this testimony, the jury should have reduced its lost wage award by an amount equal to at least 15 hours of work for each week of the measured period, or by approximately $117,000.00. (Tr. 4/2/08, at p. 188, ll. 23-25).

Under similar circumstances, the court in *Henry v. Hess Oil Virgin Islands Corp.*, 163 FR.D. 237, 248 (D.V.I. 1995) ordered a new trial:

> Because neither Dr. Payne nor Dr. Copemann testified that Plaintiff was completely disabled, Professor Robert's second set of calculations, which presumed that Plaintiff would never again be employed, was misleading and prejudicial under *Rule 403 of the Federal Rules of Evidence.* As such, it was inadmissible.

(internal citations omitted). As, the jury erroneously failed to account for any measure of residual earning capacity, their verdict is against the manifest weight of the evidence, and this Court should order a new trial on damages to prevent a miscarriage of justice.

***F. Taken as a Whole, the Trial Errors Cumulatively Prevented Bobcat Company from Receiving a Fair Trial.***

The cumulative impact of the forgoing errors precluded the jury from fairly weighing the parties' claims using properly admitted evidence. While each of the above errors entitles it to a new trial, there can be no reasonable dispute that these cumulative and incurable errors prejudiced Bobcat Company and require a new trial on all issues. The Court must weigh the cumulative prejudice resulting from each individual instance of claimed prejudicial error rendered the entire trial "fundamentally unfair." *Moody v. Ford Motor Co.*, 2007 U.S. Dist. LEXIS 44495, at *39 (N.D. Ok. Jun. 18, 2007) (granting new trial on all issues where party moving for new trial claimed fundamental unfairness due to counsel's misconduct and improper admission of other accident evidence); *Cerabio, LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981 (7th Cir. 2005) (reversing district court and remanding for consideration of cumulative prejudice resulting from evidentiary ruling).

Indeed, the district court in *Ballarini, supra*, identified the same circumstances now encountered by Bobcat Company, when a single instance of attorney misconduct underscores a stratagem to appeal improperly to the jury:

> The above exchange might be viewed as harmless enough, were it not for the fact that these comments were merely the first shot in what became an unending barrage of improper comments, questions, objections, and even facial expressions, always made in the presence of the jury, which

> continued right up until the verdict. The cumulative impact of this conduct, which in my view was entirely premeditated, was to attempt to activate the jury's sympathy.

841 F. Supp. at 666. While *Ballarini* solely involved attorney misconduct, without claim of evidentiary errors, as here, the *Moody*, *Cerabio* and *Ballarini* trio requires the Court to consider the combined prejudice resulting from multiple errors and misconduct in discharging its Rule 59 obligations.

## III. RULE 59(D) CONSIDERATIONS

The Court may consider additional grounds in granting a new trial *sua sponte* or in considering Bobcat Company's Motion for New Trial. Fed. R. Civ. Pro. 59(d). Among other things, the Court should consider whether the unusual events in this trial have been influenced by other contemporaneous high profile trials in the Western District. The jury here could have been influenced by matters in the temporally proximate trial in *United States v. Wecht*, Cr. 06-00026, including the lengthy jury deliberations, motions for mistrial during deliberations (ultimately declared on April 8, 2008), and negative commentary of the justice system, and the highly publicized *Hickenbottom v. Nassan*, Civ. 03-00223, which resulted in a $28 million verdict.

## CONCLUSION

For the reasons stated above,[10] Bobcat Company respectfully requests this Honorable Court vacate the April 9, 2008 judgment against it and grant it a new trial on all issues pursuant to Rule 59.

---

10 Bobcat Company has ordered the trial transcript and reserves the right to supplement this Motion with different or additional bases upon its review.

Respectfully submitted,

WAYMAN, IRVIN & McAULEY, LLC

By: /s/ *James W. Creenan*
Mark J. Gesk, Esquire
Pa. ID No. 26392
James W. Creenan, Esquire
Pa. ID No. 79213

Ian C. Walchesky, Esquire
Pa. ID No. 200222

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the **Memorandum of Law In Support of Motion for a New Trial and Other Relief** has been served on the following counsel of record via electronic service, this 21st day of April 2008:

Dallas Hartman, Esquire
Wayne P. Reid, Esquire
2815 Wilmington Road
New Castle, PA 16105
*(Counsel for Plaintiffs)*

Paul Walsh, Esquire
Walsh, Collis & Blackmer, LLC
707 Grant Street
Pittsburgh, PA 15219
(*Counsel for Leppo, Inc.)*

The Honorable Donetta W. Ambrose
Chief Judge, United States District Court
For the Western District of Pennsylvania
U.S. Courthouse, Courtroom 3B
Pittsburgh, PA 15219

WAYMAN, IRVIN & McAULEY, LLC

BY: /s/ *James W. Creenan*
Mark J. Gesk, Esquire
James W. Creenan, Esquire
Ian C. Walchesky, Esquire